LATHAM & WATKINS LLP
Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
Kristin Sheffield-Whitehead (Bar No. 304635)
*kristin.whitehead@lw.com*
Catherine A. Rizzoni (Bar No. 322267)
*cat.rizzoni@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Margaret A. Upshaw (*pro hac vice*)
*maggie.upshaw@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendant*
*Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

M.D. and O.F., individually and on behalf of all others similarly situated,

Plaintiffs,

v.

GOOGLE LLC and META PLATFORMS, INC.,

Defendants.

Case No. 3:24-cv-06369-AMO

**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Hearing: April 30, 2026
Time: 2:00 p.m.
Location: Courtroom 10—19th Floor
Judge: Hon. Araceli Martínez-Olguín

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on April 30, 2026 at 2:00 p.m., before the Honorable Araceli Martínez-Olguín, United States District Court, Courtroom 10, 19th Floor, 450 Golden Gate Ave., San Francisco, California, Defendant Meta Platforms, Inc. ("Meta") will and hereby does move for an order dismissing Plaintiffs M.D. and O.F.'s (collectively, "Plaintiffs") Second Amended Class Action Complaint (Dkt. 58) for failure to state a claim under Rule 12(b)(6). This motion is based on this notice of motion; the memorandum of points and authorities in support thereof that follows; the proposed order filed concurrently herewith; the request for judicial notice and accompanying declaration; the pleadings, records, and papers on file in this action; oral argument; and any other matters properly before the Court.

## STATEMENT OF ISSUE TO BE DECIDED

Whether the Court should dismiss the Second Amended Class Action Complaint for failure to state any claim upon which relief can be granted under Rule 12(b)(6).

Dated: December 8, 2025

Respectfully submitted,

LATHAM & WATKINS LLP

By */s/ Melanie M. Blunschi*
Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
Kristin Sheffield-Whitehead (Bar No. 304635)
*kristin.whitehead@lw.com*
Catherine A. Rizzoni (Bar No. 322267)
*cat.rizzoni@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Margaret A. Upshaw (*pro hac vice*)
*maggie.upshaw@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendant*
*Meta Platforms, Inc.*

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

A. The Meta Pixel ..... 2

B. Meta's Terms And Policies ..... 3

1. Meta's Terms Of Service, Privacy Policy, And Cookies Policy ..... 3

2. Meta's Business Tools Terms ..... 5

C. BlueChew's Terms And Privacy Policy ..... 5

D. This Lawsuit ..... 6

1. The Court's Dismissal Of The FAC ..... 6

2. Plaintiffs' SAC ..... 7

III. LEGAL STANDARD ..... 8

IV. ARGUMENT ..... 8

A. All Of Plaintiffs' Claims Against Meta Fail Because Plaintiffs Consented To Meta's Receipt Of Their Data ..... 9

1. Plaintiffs Fail To Adequately Allege That The Data Sharing Occurred Prior To BlueChew's 2024 Privacy Policy ..... 9

2. Plaintiffs Consented By Agreeing To Meta's Policies ..... 11

B. Plaintiffs' CIPA And WESCA Claims Are Barred By The Statutes Of Limitations ..... 14

C. Plaintiffs' CIPA And WESCA Claims Fail Because Plaintiffs' Allegations That Meta Received Information Do Not Show That Meta Violated The Statutes ..... 16

D. All Of Plaintiffs' Claims Against Meta Fail Because Plaintiffs Fail To Allege That Meta Intended To Intercept Sensitive Data ..... 18

E. Plaintiffs' Claims Fail For Additional Reasons ..... 21

1. Plaintiffs' CIPA Section 632 And WESCA Claims Fail Because Intangible Code From The Pixel Is Not A Device ..... 21

2. Plaintiff M.D.'s Section 632 Claim Fails Because He Does Not Allege His Communications Were 'Confidential' ..... 23

3. Plaintiff M.D.'s Clause One Section 631 Claim Fails Because He Does Not Allege Any Telephonic Communications ........ 24

4. Plaintiff M.D.'s Invasion Of Privacy Claim Fails Because He Does Not Plead Highly Offensive Conduct ........ 24

V. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adams v. Johnson*,
355 F.3d 1179 (9th Cir. 2004) ....................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................8, 10, 19

*B.K. v. Desert Care Network*,
2024 WL 1343305 (C.D. Cal. Feb. 1, 2024) ....................20

*Bailey v. United States*,
516 U.S. 137 (1995) ....................17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................1, 8, 10

*Belluomini v. Citigroup Inc.*,
2013 WL 5645168 (N.D. Cal. Oct. 16, 2013) ....................25

*Boulton v. Community.com, Inc.*,
2025 WL 314813 (9th Cir. Jan. 28, 2025) ....................23

*Bristow v. Clevenger*,
80 F. Supp. 2d 421 (M.D. Pa. 2000) ....................14

*Calhoun v. Google*,
113 F.4th 1141 (9th Cir. 2024) ....................13

*Caraccioli v. Facebook, Inc.*,
167 F. Supp. 3d 1056 (N.D. Cal. 2016) ....................20

*Cody v. Ring*,
718 F. Supp. 3d 993 (N.D. Cal. 2024) ....................24

*Commonwealth v. Proetto*,
771 A.2d 823 (Pa. Super. 2001) ....................18

*Coyne v. Porter-Hayden Co.*,
428 A.2d 208 (Pa. Super. 1981) ....................14

*Davis v. Fresno Unified Sch. Dist.*,
14 Cal. 5th 671 (2023) ....................22

*Doe I v. Google LLC*,
2025 WL 1616720 (N.D. Cal. June 6, 2025) ....................19

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) ........................................................ 2, 20, 21

*Doe v. Eating Recovery Ctr.*,
2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) ........................................................ 16, 23

*Doe v. GoodRx Holdings, Inc.*,
2025 WL 2052302 (N.D. Cal. July 22, 2025) ........................................................ 13, 15, 20, 21, 24

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ........................................................ 21

*Eisenberg v. Citibank, NA*,
787 F. App'x 929 (9th Cir. 2019) ........................................................ 15

*F.C.C. v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ........................................................ 16

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (2002) ........................................................ 23, 24

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (2005) ........................................................ 14

*Fraser v. Nationwide Mut. Ins. Co.*,
352 F.3d 107 (3d Cir. 2003) ........................................................ 18

*Gonzales v. Carhart*,
550 U.S. 124 (2007) ........................................................ 21

*Groth-Hill Land Co., LLC v. General Motors LLC*,
2013 WL 3853160 (N.D. Cal. July 23, 2013) ........................................................ 11

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ........................................................ 25

*Hauck v. Advanced Micro Devices, Inc.*,
2019 WL 1493356 (N.D. Cal. Apr. 4, 2019) ........................................................ 10

*Heiting v. Taro Pharms. USA, Inc.*,
728 F. Supp. 3d 1112 (N.D. Cal. 2024) ........................................................ 10

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ........................................................ 18

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal. 4th 1 (1994) ........................................................ 25

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ........................................................ 21

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ....................25

*In re Vizio, Inc. Consumer Privacy Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) ....................10

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023) ....................15

*Kline v. Security Guards, Inc.*,
159 F. Supp. 2d 848 (E.D. Pa. 2001) ....................18

*Lau v. Gen Digit. Inc.*,
2023 WL 10553772 (N.D. Cal. Sept. 13, 2023) ....................14

*Lloyd v. Facebook, Inc.*,
2023 WL 1802415 (N.D. Cal. Feb. 7, 2023) *aff'd in relevant part*, 2024 WL 3325389 (9th Cir. July 8, 2024) ....................11

*Lloyd v. Facebook, Inc.*,
2024 WL 3325389 (9th Cir. July 8, 2024) ....................1, 12, 13, 19

*M.G. v. Therapymatch, Inc.*,
2024 WL 4219992 (N.D. Cal. Sept. 16, 2024) ....................25

*McCarn v. HSBC USA, Inc.*,
2012 WL 5499433 (E.D. Cal. Nov. 13, 2012) ....................15

*McCulligan v. Pennsylvania State Police*,
123 A.3d 1136 (Pa. Commw. 2015), *aff'd*, 135 A.3d 580 (Pa. 2016) ....................14

*Meta Platforms, Inc. v. Nguyen*,
2023 WL 8686924 (N.D. Cal. Nov. 21, 2023) ....................11

*Moreno v. San Francisco Bay Area Rapid Transit Dist.*,
2017 WL 6387764 (N.D. Cal. Dec. 14, 2017) ....................22

*Mountain Vill. v. Bd. of Supervisors*,
828 A.2d 411 (Pa. Commw. 2003) ....................23

*People v. Braden*,
14 Cal. 5th 791 (2023) ....................22

*People v. Hyatt*,
109 Cal. App. 5th 735 (2025) ....................16, 23

*People v. Nakai*,
183 Cal. App. 4th 499 (2010) ....................24

*R.C. v. Sussex Publishers, LLC*,
2025 WL 948060 (N.D. Cal. Mar. 28, 2025)....16, 17

*Rodriguez v. Google, LLC*,
2021 WL 2026726 (N.D. Cal. May 21, 2021)....23, 24

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018)....1, 12, 13

*Smith v. LoanMe, Inc.*,
11 Cal. 5th 183 (2021)....18

*Stiles v. Wal-Mart, Inc.*,
2018 WL 3093501 (E.D. Cal. June 20, 2018)....10

*Torres v. Prudential Fin., Inc.*,
2025 WL 1135088 (N.D. Cal. Apr. 17, 2025), *appeal pending*, No. 25-3203 (9th Cir.)....16

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015)....18, 19, 20

*Valenzuela v. Keurig Green Mountain, Inc.*,
674 F. Supp. 3d 751 (N.D. Cal. 2023)....17

*Williams v. DDR Media, LLC*,
757 F. Supp. 3d 989 (N.D. Cal. 2024)....17

*Wilson v. El-Daief*,
964 A.2d 354 (Pa. 2009)....14

**STATUTES**

18 Pa. Cons. Stat. § 5702....18, 22, 23

18 Pa. Cons. Stat. § 5703....18

Cal. Civ. Code § 1798.140....8

Cal. Penal Code § 631....18

Cal. Penal Code § 631(a)....16

Cal. Penal Code § 632....18, 23

Cal. Penal Code § 632(a)....17, 22

Cal. Penal Code § 632(c)....23

## RULES

Fed. R. Civ. P. 8(a)(2) ........................................................................................................10

## OTHER AUTHORITIES

Device, Merriam-Webster Online (https://www.merriam-webster.com/dictionary/device) (2017) ........................................................................ 22

## I. INTRODUCTION

Plaintiffs' Second Amended Class Action Complaint ("SAC") fails to cure the deficiency this Court identified in their First Amended Complaint, because Plaintiffs still fail to allege that they did not consent to BlueChew's alleged collection and transmission of Plaintiffs' data through code from the Meta Pixel. Because Plaintiffs have not cured that deficiency (or any of the other deficiencies Meta identified) even after a third try, the SAC should be dismissed with prejudice.

This Court dismissed Plaintiffs' previous complaint because BlueChew's 2024 Privacy Policy secured Plaintiffs' consent to the sharing of their information, and Plaintiffs failed to allege that the data sharing occurred before that "consent[] in August 2024." Dkt. 57 at 9-10. The Court granted Plaintiffs leave to amend to "proffer factual allegations" showing the challenged data sharing occurred before August 2024. *Id.* at 10. But Plaintiffs have not done so: They make only a bare assertion to that effect, devoid of any factual content to support it. That is not enough to "nudge[] their claims across the line from conceivable to plausible." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court should therefore dismiss on the same basis again.

Plaintiffs' amendment also reveals a *new* barrier to their ability to plead lack of consent. Plaintiffs now allege, for the first time, that they "maintained active accounts with [] Facebook." SAC ¶ 11. Like all Facebook users, Plaintiffs agreed to Meta's Terms of Service, Privacy Policy, and Cookies Policy. And, as the Ninth Circuit has held, Meta's disclosures in its policies establish consent for Meta to receive data from third parties about users' activity on third-party websites—regardless of those websites' own representations. *See Smith v. Facebook, Inc.*, 745 F. App'x 8, 8-9 (9th Cir. 2018) (affirming dismissal of CIPA and privacy claims); *Lloyd v. Facebook, Inc.*, 2024 WL 3325389, at *2 (9th Cir. July 8, 2024) (similar). Meta's policies clearly disclose that third-party websites may incorporate code from Meta's Pixel, and that Meta may receive data from those websites and may use that data to serve ads. Those disclosures foreclose Plaintiffs' claims.

Plaintiffs' complaint fails for numerous other reasons as well.

*First*, even if Plaintiffs had sufficiently alleged that BlueChew used Pixel code in 2022 and 2023 to improperly send information to Meta, their statutory claims are time-barred because their website visits occurred over a year (for CIPA) and two years (for WESCA) before they filed suit.

*Second*, Plaintiffs' CIPA and WESCA claims also fail for a more fundamental reason: Plaintiffs' allegations that BlueChew incorporated code from the Pixel into its website and improperly *sent* Plaintiffs' data to Meta do not demonstrate that Meta read or learned, eavesdropped upon, or intercepted Plaintiffs' communications with BlueChew *while* those communications were *in transit* to BlueChew. Meta thus did not violate these statutes by their plain terms. And because they are criminal statutes, they must be narrowly construed.

*Third*, Plaintiffs also fail to allege that Meta acted with the requisite *intent* to intercept sensitive health information. Plaintiffs' allegations that *BlueChew* configured code from the Pixel to improperly collect and disclose their "confidential [prescription] information," SAC ¶¶ 7, 9, do not show that *Meta* intended to obtain such information. And Meta's Business Tools Terms contractually prohibiting websites from sending "sensitive" or "health" information demonstrate that Meta "purposefully acted so as *not* to receive any personal health information." *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 840 (N.D. Cal. 2024). This defeats all of Plaintiffs' claims.

*Finally*, Plaintiffs' claims also fail for several additional reasons. The CIPA Section 632 claim and the WESCA claim fail because Pixel code is not a "device" within the meaning of those provisions. The CIPA Section 632 claim fails because the communications were not "confidential." The CIPA Section 631(a) claim fails to the extent it is based on clause one, which applies to telephones. And the invasion of privacy claim fails because Meta's receipt of information is not the kind of highly offensive conduct this claim requires.

The SAC should be dismissed in its entirety. Plaintiffs' repeated failure to cure the defects in their claims confirms they cannot do so. Accordingly, dismissal should be with prejudice.

## II. BACKGROUND[1]

### A. The Meta Pixel

As Meta previously explained, the Meta Pixel is publicly available software code that many businesses choose to integrate into their websites to "measure the effectiveness of their

[1] Unless otherwise indicated, the facts recited herein are based on the allegations of the SAC and are accepted as true only for purposes of this motion.

advertising" and "understand[] actions people take on [their] websites." Ex. 1 at 1; *see* SAC ¶ 31.[2] Website developers, not Meta, decide whether to "integrate" code from the Pixel, and "advertisers can choose" which actions to measure. SAC ¶¶ 29-30; *see* Ex. 2 at 1-2. These actions are referred to as "events." SAC ¶ 30. Web developers choose how to configure the code and which events to use, and Meta explains how to configure the Pixel code so that it does *not* capture data developers do not want to send. *See* Ex. 4 at 8-9. For example, Meta explains that the Meta Pixel code "only" measures events "on the pages you added them to," Ex. 2 at 2, and provides instructions for developers to configure the Pixel code "to not send [certain] additional information"—like "button click" data—and to "restrict the data sent to one of the Pixels on your website." Ex. 4 at 8-9.

For the events that web developers do decide to send to Meta, web developers can use this data about how their users interact with their websites to improve their services and measure the effectiveness of their advertising. *See* Ex. 1 at 1; *see also* SAC ¶¶ 29, 32-33. Businesses can also reach customers who have already engaged with their products by showing them targeted ads on Meta's services. *See* SAC ¶¶ 28-29, 33.

### B. Meta's Terms And Policies

Meta publishes policies for Facebook users (like Plaintiffs) that explain how Meta receives and uses data, including through web developers' incorporation of Meta Pixel code. Meta's policies disclose that businesses may integrate Pixel code into their websites, and that when they do so, websites may share data with Meta. Meta also publishes terms and policies that govern developers' use of Meta Pixel code, including by mandating that developers provide prominent notice of the Pixel on their websites and refrain from sending certain information to Meta.

#### 1. Meta's Terms Of Service, Privacy Policy, And Cookies Policy

When Facebook users—like Plaintiffs, SAC ¶ 11—sign up for Facebook, they agree to Meta's Terms of Service, Privacy Policy, and Cookies Policy. *See* Ex. 22 (cited at SAC ¶ 25 n.5) (stating that "[b]y clicking Sign Up, you agree to our Terms, Privacy Policy, and Cookies Policy");

---

[2] All "Ex." references are to the exhibits attached to the concurrently filed Declaration of Melanie M. Blunschi.

*see, e.g.*, Ex. 25 at 1 (Terms "govern [the] use" of Meta products).[3] Meta's Terms explain that "businesses and organizations, and other persons pay us to show you ads for their products," and that Meta "use[s] your personal data to help determine which personalized ads to show you." *Id.* As part of using Meta's free services, users "agree that [Meta] can show you ads that [it] think[s] may be relevant to you and your interests." *Id.*

Meta's Privacy Policy describes the data that Meta collects and receives, including from third parties. It explains that businesses can use tools like Meta Pixel code to "advertise or support their products" and "understand and measure how people are using their products and services." Ex. 28 at 12. Meta informs users that these third parties "collect your information when you visit their site or app or use their services." *Id.* at 6. Meta's Privacy Policy further discloses that Meta "receive[s] information" from those third parties "about a variety of your information and activities on and off [Meta's] Products," including "device information," "[p]urchases and transactions you make," "[h]ow you use [third parties'] products and services," and "[w]ebsites you visit and cookie data." *Id.* at 5-6; *see also id.* at 11 (Meta "receive[s] information using cookies and … the Meta Pixel"). The Policy also discloses that Meta receives identifying information, like "advertising device ID" and "cookies," that "helps [Meta] match your activities with your account," and explains that Meta "connect[s] information from partners to your account." *Id*. at 5-6.[4]

The Terms and Privacy Policy also link to Meta's Cookies Policy,[5] which explains that Meta "use[s] cookies" "to store and receive identifiers" if a user "ha[s] a Facebook account" or "visit[s] other websites and apps that use the Meta Products," including Meta Pixel code. Ex. 32 at 1 (cited at SAC ¶ 47 n.28). The Cookies Policy explains that Meta "uses cookies and receives information," "including device information and information about your activity," when users visit

---

[3] References to the Meta terms and policies are to the versions in effect in December 2022, when Plaintiff M.D. alleges he made his first purchase from BlueChew. SAC ¶ 7; *see* Meta Terms of Service, Ex. 25 at 8 (explaining that "[o]nce any updated Terms are in effect, you will be bound by them if you continue to use [Meta] Products"). The other applicable versions of Meta's Privacy Policy use similar language, except where otherwise noted.

[4] The Privacy Policies in effect in January 2022 similarly made clear that Meta "use[s]" all the information it collects and receives, including information from third parties and identifiers, to "connect information about your activities on different Meta Products and devices" and "select and personalize ads." Ex. 27 at 4; Ex. 26 at 3-4.

[5] *See* Meta Terms of Service, Ex. 25 at 1; Meta Privacy Policy, Ex. 28 at 1, 6, 11.

websites where businesses have "incorporate[d] Meta technologies into their websites." *Id*. It also reiterates that businesses may use "Meta Pixel" code to share information about "your interactions with them." *Id.* at 21. The Cookies Policy, like the Privacy Policy, discloses that Meta "use[s] cookies" to "deliver ads to people who have previously visited a business's website [or] purchased its products." *Id.* at 6. The Cookies Policy also explains that "business partners" may set cookies "in their own websites' domains" to "personalize" ads and "produce analytics." *Id.* at 14.

**2. Meta's Business Tools Terms**

Meta separately sets forth restrictions on how code from the Pixel may be used through its Business Tools Terms, which bind the third-party web developers that choose to use code from the Meta Pixel. Ex. 20 at 1; Ex. 21 at 1. Meta's Business Tools Terms require businesses using code from the Pixel to "represent and warrant that [they] have provided robust and sufficiently prominent notice" "on each web page where [Meta's] pixels are used." Ex. 20 at 2; Ex. 21 at 2 (same). The Business Tools Terms also require businesses to represent that they "have all of the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use" of data they send through the Meta Pixel. Ex. 20 at 1; Ex. 21 at 1. And Meta further requires developers to "represent and warrant that [the business] will not share Business Tool Data with us that [it] know[s] or reasonably should know … includes health … information" or "sensitive" information. Ex. 20 at 1; *see* Ex. 21 at 1.

**C. BlueChew's Terms And Privacy Policy**

Plaintiffs allege that BlueChew is "a telemedicine platform" that offers prescription erectile dysfunction medications. SAC ¶ 18. BlueChew's website allows users to purchase medication after completing a "medical profile" and questionnaire. *Id.* ¶¶ 21-23. As this Court previously explained, a "visitor cannot proceed to enter personal information or order medication without logging into a preexisting account or signing up for a new one." Dkt. 57 at 7. And, to sign up, "a visitor must affirmatively 'agree to [the] Terms & Conditions,' which are hyperlinked and which incorporate the Privacy Policy." *Id.*; *see also* Exs. 5-9 (account registration pages); Ex. 12 at 2 (BlueChew Terms) ("[I]f you register for an account, you are accepting our Privacy Policy.").

Throughout the relevant time, BlueChew's Privacy Policy disclosed that BlueChew may

collect information about site usage through "cookies, web beacons, and other technologies," and that it may share personally identifiable information "with service providers" that support the website. Ex. 17 at 2. BlueChew's 2024 Privacy Policy further informed users that BlueChew uses tracking technologies, including the Meta Pixel specifically, to "keep track of what users do after they see or click on a Facebook or Instagram advertisement," and to "keep track of users who access our Website or advertisements from different devices." Ex. 19 at 3. It explicitly discloses that "data from Meta Pixel is also saved and processed by Facebook." *Id.*

**D. This Lawsuit**

Plaintiff M.D. filed his initial complaint on September 10, 2024, alleging California wiretapping, eavesdropping, and invasion of privacy claims against Meta and Google based on their alleged receipt of information from BlueChew about his purchase activity. Dkt. 1. Meta moved to dismiss, arguing (among other things) that Plaintiff M.D.'s claims failed because he agreed to BlueChew's Privacy Policy, which disclosed the data collection, and failed to allege facts showing that Meta intended to receive sensitive data. Dkt. 28. Plaintiffs then filed the FAC, adding two new plaintiffs from Pennsylvania and Maryland, who brought additional claims under their states' wiretapping statutes, without curing any of the deficiencies Meta had identified. Dkt. 34. Meta again moved to dismiss, Dkt. 37, and this Court granted that motion. Dkt. 57.

**1. The Court's Dismissal Of The FAC**

This Court dismissed Plaintiffs' FAC in its entirety. The Court concluded that Plaintiffs failed to sufficiently allege that BlueChew transmitted data to Meta without its users' consent. Dkt. 57 at 6-10. The Court recognized that Plaintiffs' claims "all rely on the absence of consent," *id.* at 10, and that Plaintiffs were required to "plausibly allege … [they] did not consent to the alleged interception or recording," *id.* at 6. The Court explained that BlueChew's 2024 Privacy Policy "clearly stated that BlueChew would use the 'Meta Pixel' to 'keep track of what users do after they see or click on a Facebook or Instagram advertisement,'" that "BlueChew collects 'Personal Information consisting of health information,' and that it shares such 'Personal Information' 'with third parties,' including for advertising and data analysis." *Id.* at 9. The Court therefore concluded that the 2024 Policy "establishes users' consent to the data collection practices," and defeats any

claim against Meta based on data sharing that occurred after adoption of that policy. *Id.*[6] Because Plaintiffs' FAC contained no allegations that "the data sharing practices to which users consented in August 2024 were previously undertaken"—including when Plaintiffs M.D. and O.F. made their purchases in 2022 and 2023—it failed to state any claim. *Id.* at 9-10. The Court granted leave to amend based on the "potential" that "Plaintiffs may still be able to proffer factual allegations that support their claims of privacy violations for the period preceding the adoption of the August 2024 Privacy Policy." *Id.* at 10.

**2. Plaintiffs' SAC**

Plaintiffs filed their SAC on October 24, 2025. The SAC drops the Maryland plaintiff (Plaintiff J.P.), who alleged that he used BlueChew in 2024, and his Maryland claims. Plaintiffs M.D. and O.F. again allege that they were "prescribed and ordered" erectile dysfunction medication through the BlueChew website. SAC ¶¶ 7, 9. Plaintiff M.D. alleges that he is a California citizen and ordered medication from BlueChew on December 6, 2022 and January 4, 2023—more than a year and half before he filed suit. *Id.* ¶ 7. Plaintiff O.F. alleges that he is a Pennsylvania citizen and ordered medication from BlueChew in January 2022—three years before he filed suit. *Id.* ¶ 9. For the first time, Plaintiffs allege that they "maintained active accounts with both Facebook and Google at all relevant times." *Id.* ¶ 11.

Plaintiffs reiterate their allegations that BlueChew disclosed purportedly "confidential information related to [Plaintiffs'] medical prescription[s]" to Google and Meta by "integrat[ing]" software code "into [its] website." *Id.* ¶¶ 7, 9, 31. Plaintiffs allege that BlueChew configured code from the Pixel to send Meta limited basic information like name and date of birth, *see id.* ¶¶ 39, 41; the fact that a user has registered for an account on BlueChew, *id.* ¶¶ 39-40; and the "content ID" of the medication being purchased, which appears as a number, *see id.* ¶¶ 39-43. Based on these actions, the Pixel code allegedly generates specific "events" titled "CompleteRegistration" and "AddToCart," which are transmitted to Meta. *Id.* ¶ 40. Plaintiffs again allege that Meta "can [] match" these pieces of information to one another, *id.* ¶ 55, and that Meta can use the numerical

---

[6] The 2024 Privacy Policy was submitted as it appeared on August 16, 2024, but was effective as of June 17, 2024. *See* Ex. 19 at 1.

content ID to determine the medication purchased, *id.* ¶ 43. Plaintiffs allege that "[a]fter" this data was collected, Meta "processed, analyzed, and assimilated it into datasets." *Id.* ¶ 56.

In response to the Court's decision requiring "factual support" to show "the challenged data sharing practices were in place before" the adoption of the 2024 Privacy Policy, Dkt. 57 at 9, Plaintiffs add only the following: (1) assertions that BlueChew's data sharing "occurred at the time of" each Plaintiffs' purchases, SAC ¶¶ 7, 9; and (2) an assertion that the data sharing "practices were in place on the Website before and during when Plaintiffs made their purchases." *Id.* ¶ 57. Plaintiffs separately *remove* an allegation that Plaintiffs received targeted advertisements "relating to erectile dysfunction medications" after they made their purchases on BlueChew's website. *See* Dkt. 1 ¶ 8; Dkt. 34 ¶¶ 8, 10, 12. The SAC instead alleges that "[u]nbeknownst to [Plaintiffs], such information w[as] then used for targeted advertising purposes." SAC ¶¶ 8, 10. Finally, Plaintiffs add allegations that the information BlueChew allegedly sent to Meta is "legally protected" under the CCPA, Cal. Civ. Code § 1798.140. SAC ¶¶ 78-82.

Plaintiffs again bring claims against Meta under Sections 631 and 632 of CIPA, Section 5703 of WESCA, and for invasion of privacy under the California constitution.

## III. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (cleaned up); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-80 (2009). "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

## IV. ARGUMENT

Plaintiffs fail to cure the deficiency this Court identified in dismissing the previous complaint, because they still fail to allege *facts* showing that BlueChew used code from Meta's Pixel and sent the information at issue to Meta prior to August 2024, when (as this Court found) BlueChew's policies clearly secured consent. And Plaintiffs' amendments raise a new, independent consent barrier: as Meta users, Plaintiffs agreed, through Meta's Terms and policies,

that Meta *could* receive information about their activities—including purchases—on third-party sites. That forecloses all of their claims.

Plaintiffs' claims also fail for several other reasons. The CIPA and WESCA claims are barred by the statute of limitations. And Plaintiffs cannot state those claims in any event, because Meta's *receipt* of information from BlueChew does not show that Meta read or learned, eavesdropped upon, or intercepted Plaintiffs' communications while those communications were *in transit.* Nor can Plaintiffs allege that Meta *intended* to intercept any "health" or "sensitive" data, when it was BlueChew that chose to incorporate code from the Pixel on its own website, and Meta imposed terms prohibiting it from transmitting any sensitive data and provided instructions as to how not to send specific types of data. Even aside from these failures, Plaintiffs' claims suffer from additional defects that warrant dismissal. And because Plaintiffs have not cured these deficiencies even after three complaints, dismissal should be with prejudice.

### A. All Of Plaintiffs' Claims Against Meta Fail Because Plaintiffs Consented To Meta's Receipt Of Their Data

Plaintiffs still fail to allege they did not consent to BlueChew's transmission of information to Meta. As this Court held, "[u]nder CIPA [and] WESCA," a plaintiff "must plausibly allege that the complained-of interception occurred without consent." Dkt. 57 at 6. And "Plaintiff M.D.'s invasion of privacy claim" likewise "falters" if he consented to the data sharing of which he complains. *Id.* Here, Plaintiffs fail to allege any "factual support" demonstrating that they did not consent to Meta's receipt of their information. *Id.* at 10. Nor could they, as both BlueChew's and Meta's policies independently demonstrate that Plaintiffs *did* consent.

#### 1. Plaintiffs Fail To Adequately Allege That The Data Sharing Occurred Prior To BlueChew's 2024 Privacy Policy

This Court correctly recognized that BlueChew's 2024 Privacy Policy secured users' consent to BlueChew's use of Meta Pixel code to send the information at issue to Meta. And because the FAC lacked any factual allegations showing that BlueChew used Pixel code to send such information before the adoption of its 2024 policy, the Court correctly concluded that Plaintiffs failed to state their claims.

The SAC does not cure that problem. Plaintiffs reallege the exact same factual allegations about the operation of Meta's Pixel code. *Compare* SAC ¶¶ 25-58, *with* Dkt. 34 ¶¶ 26-58. And they use the same screenshot "[e]xamples" which allegedly show what "Facebook intercepts"—in the present tense. SAC ¶¶ 39, 41-42. The *only* new allegations consist of (1) a paragraph following those allegations that asserts: "These exact practices were in place on the Website before and during" Plaintiffs' purchases, *id.* ¶ 57; and (2) a bare statement that the "interceptions occurred at the time of [each Plaintiff]'s purchase," *id.* ¶¶ 7, 9.

These conclusory statements are not enough to "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible." Dkt. 57 at 10 (quoting *Twombly*, 550 U.S. at 570). This Court made clear that Plaintiffs must supply "*factual* allegations that support [Plaintiffs'] claims of privacy violations for the period preceding the adoption of the August 2024 Privacy Policy." Dkt. 57 at 10 (emphasis added); *see id.* (dismissing complaint for lack of "factual support"). But Plaintiffs' conclusory assertion that the data sharing "practices were in place before and during" the time Plaintiffs made their purchases, SAC ¶ 57, merely parrots the Court's order requiring Plaintiffs to show "that the challenged data sharing practices were in place before Defendants obtained Plaintiffs' consent to employ them." Dkt. 57 at 9. In other words, Plaintiffs now *assert* that the necessary condition is met, but they do not provide any supporting "factual content." *Iqbal*, 556 U.S. at 678. Because Plaintiffs include no "well-pleaded facts" that would "permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that [Plaintiffs are] entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. Proc. 8(a)(2)).

Courts routinely find similar allegations that merely restate pleading requirements insufficient where they are devoid of real factual substance. For example, in *In re Vizio, Inc. Consumer Privacy Litig.*, the court dismissed plaintiffs' CIPA claim, concluding it failed to plead that communications were intercepted "in transit." 238 F. Supp. 3d 1204, 1226-28 (C.D. Cal. 2017). Plaintiffs' "conclusory allegation[s]" that the alleged interception occurred "during transmission," and that "Vizio's data collection occurs 'in real time,'" were insufficient because they lacked factual support. *Id.* at 1228; *see also Heiting v. Taro Pharms. USA, Inc.*, 728 F. Supp. 3d 1112, 1126 (C.D. Cal. 2024) (new allegation that "[b]y virtue of how the Genesys API

functions, … communications were intercepted 'in transit'" failed to provide sufficient "factual allegations"). Other courts have likewise dismissed complaints lacking factual substance in other contexts. *E.g.*, *Hauck v. Advanced Micro Devices, Inc.*, 2019 WL 1493356, at *18 (N.D. Cal. Apr. 4, 2019), *aff'd*, 816 F. App'x 39 (9th Cir. 2020) (plaintiff "alleged[] no facts to support the conclusory, element-mirroring allegation that she would have paid less for the processor had she known" of the defect); *Stiles v. Wal-Mart Stores, Inc.*, 2018 WL 3093501, at *4 (E.D. Cal. June 20, 2018) (no "facts supporting th[e] conclusory allegation" that "no other retailer will sell" a product that "'failed' at Wal-mart"); *Groth-Hill Land Co., LLC v. General Motors LLC*, 2013 WL 3853160, at *17 (N.D. Cal. July 23, 2013) (no deference to "conclusory and self-serving allegation that" cause of action accrued on given date).

The same issue dooms Plaintiffs' SAC. It alleges no *facts* suggesting the practices Plaintiffs describe were in place in 2022 or 2023. Plaintiffs do not, for example, allege that they received targeted ads on Facebook soon after their purchases on BlueChew's website. In fact, they *remove* their prior allegation about targeted advertising—an allegation that never specified when they allegedly saw those ads (or who served them) in any event. *Compare* Dkt. 34 ¶¶ 8, 10, 11, *with* Dkt. 58 ¶¶ 8, 10. Nor do Plaintiffs cite any public sources that support their assertion, as they do extensively elsewhere in their SAC when describing the alleged functioning of Pixel code. In short, Plaintiffs have done nothing to *show* that BlueChew used Pixel code and transmitted their data when they made their purchases in 2022 and 2023. *See* Dkt. 57 at 5. They thus fail to remedy the defect the Court identified, and the complaint should again be dismissed—this time with prejudice.

### 2. Plaintiffs Consented By Agreeing To Meta's Policies

Even if Plaintiffs had sufficiently alleged that BlueChew used code from the Pixel and shared the data at issue before BlueChew obtained Plaintiffs' consent, Plaintiffs still cannot state any claim against Meta, because Plaintiffs independently consented to Meta's receipt of information about their activity on third-party websites by agreeing to Meta's Terms and policies.

Plaintiffs now allege that they had active Facebook accounts when they used BlueChew. SAC ¶ 11. Like "all users," they were required to "agree" to the Terms (and incorporated policies) "to create a Facebook account." *Lloyd v. Facebook, Inc.*, 2023 WL 1802415, at *1 (N.D. Cal. Feb.

7, 2023) *aff'd in relevant part*, 2024 WL 3325389 (9th Cir. July 8, 2024); *see also, e.g.*, *Meta Platforms, Inc. v. Nguyen*, 2023 WL 8686924, at *2 (N.D. Cal. Nov. 21, 2023) ("All Facebook users must agree to its Terms of Service[.]"); Facebook Sign-Up Page, Ex. 22 (cited at SAC ¶ 25 n.5) ("[b]y clicking Sign Up, you agree to our Terms, Privacy Policy, and Cookies Policy").

Meta's policies clearly disclose that Meta receives data from third parties that choose to use code from the Pixel, including data that Meta can use to match web activities to particular Facebook accounts to serve ads. For example, Meta's Privacy Policy discloses that third parties can use technologies like Pixel code to "collect your information when you visit their site," Ex. 28 at 6, and that Meta "receive[s]" such information, *id.* The Privacy Policy also specifically addresses the type of information at issue here—purchase information—explaining that third parties collect and share with Meta information about "[p]urchases and transactions you make" on other websites. *Id.* at 5. The Policy further discloses that Meta receives identifying information, including "cookies," that "helps [Meta] match your activities with your account." *Id.* The Cookies Policy reiterates these disclosures, explaining that businesses may use "Meta Pixel" code to share information about "your interactions with them"; that Meta "receive[s] identifiers" through cookies when users visit websites that "incorporate Meta technologies" like Pixel code; and that Meta uses that information to "deliver ads to people who have previously visited a business's website [or] purchased its products." Ex. 32 at 1, 7, 21. That is precisely the conduct Plaintiffs complain about: they allege that they "ordered" medication from BlueChew, SAC ¶¶ 7, 9; that BlueChew shared their "purchase" actions with Meta using Pixel code, *id.* ¶¶ 38, 40; that certain identifiers were also sent through "cookies," *id.* ¶¶ 45-54; that Meta "link[ed]" information to "corresponding Facebook profiles," *id.* ¶ 54; and that this information was "used for targeted advertising purposes," *id.* ¶¶ 8, 10. Because Meta's policies "explicitly notify" users of that conduct, Dkt. 57 at 8, it is squarely within the scope of Plaintiffs' consent.

The Ninth Circuit has already twice concluded that "Facebook's data policy gives clear notice that third party partners may share data with Facebook." *Lloyd*, 2024 WL 3325389, at *2. In *Smith*, the Ninth Circuit recognized that Meta's policies disclose the precise conduct at issue here: "[a] reasonable person viewing [Facebook's] disclosures would understand that Facebook

maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes." 745 F. App'x at 8-9. The court thus held that the plaintiffs there had consented to "collect[ion] and us[e] [of] their browsing data from various healthcare-related websites" and affirmed dismissal of CIPA and privacy claims. *Id* at 8. Similarly, in *Lloyd*, the Ninth Circuit affirmed dismissal of a privacy claim where the plaintiff alleged that Meta "impermissibly track[ed] her online activity," "because Facebook's data policy gives clear notice" that such data will be shared from third parties. 2024 WL 3325389, at *2. As in *Smith* and *Lloyd*, Meta's policies confirm that Plaintiffs here consented to Meta's receipt of data from third-party websites and use of that data for advertising purposes.

Nor do BlueChew's 2022 and 2023 policies change the import of *Meta*'s policies. While this Court has previously cited *Calhoun v. Google LLC*, 113 F.4th 1141 (9th Cir. 2024) to discount Meta's disclosures where a web developer's privacy policy included promises *not* to share data, *see Doe v. GoodRx Holdings, Inc.*, 2025 WL 2052302, at *9 (N.D. Cal. July 22, 2025), *Calhoun* concerned the effect of Google's *own* policies, read together—not policies from separate entities—and it addressed a situation where it was unclear which of Google's own policies actually applied. Here, Plaintiffs point to no "service-specific privacy policies" published *by Meta* "that could reasonably be read to say the opposite of what [Meta's] general privacy policies disclosed." *Calhoun*, 113 F.4th at 1149.[7] And the Ninth Circuit has made clear that a defendant's disclosures cannot be ignored simply because a third party makes contradictory representations. Indeed, the Ninth Circuit addressed this issue directly in *Smith*. There, plaintiffs argued that "Facebook could not have gained consent because the healthcare websites' privacy policies promised not to share data with third parties." *Smith*, 745 Fed App'x at 9. The Ninth Circuit rejected that argument and "affirm[ed] the district court's finding that Plaintiffs consented to Facebook's data tracking and collection practices" when they agreed to Facebook's policies, explaining that consent was not affected by third-party policies because "Facebook is not bound by promises it did not make." *Id.*

The same reasoning applies here: Meta's "policies make no [] assurance" that Meta will

---

[7] While Meta's Business Tools Terms prohibit websites from sending sensitive information to Meta, *see infra* at 20, that restriction on developers does not operate as a promise to *users* that could alter the scope of users' express consent based on the policies they agree to.

not receive purchase data from third parties. *Id.* To the contrary, they affirmatively disclose that Meta *does* receive such data from third parties that use code from the Pixel, and that Meta may match that data with user accounts to serve ads. *Smith* thus squarely applies here, and Meta's disclosures foreclose Plaintiffs' claims.

### B. Plaintiffs' CIPA And WESCA Claims Are Barred By The Statutes Of Limitations

Even if Plaintiffs could allege that BlueChew improperly shared their data prior to 2024, Plaintiffs' statutory claims should be dismissed because they are time-barred. Plaintiff M.D.'s claims are untimely under CIPA's one-year statute of limitations, *Lau v. Gen Digit. Inc.*, 2023 WL 10553772, at *2 (N.D. Cal. Sept. 13, 2023), because he alleges that he "was prescribed and ordered" medication from BlueChew's website on December 6, 2022 and January 4, 2023. SAC ¶ 7. But he did not file his complaint until September 10, 2024, well over a year later. Similarly, Plaintiff O.F.'s claim is untimely under WESCA's two-year statute of limitations. *See Bristow v. Clevenger*, 80 F. Supp. 2d 421, 428-29 (M.D. Pa. 2000); *McCulligan v. Pennsylvania State Police*, 123 A.3d 1136, 1140 (Pa. Commw. 2015), *aff'd*, 135 A.3d 580 (Pa. 2016). O.F. alleges that he "was prescribed and ordered" medication from BlueChew in January 2022—more than two years before his complaint was filed on January 6, 2025. SAC ¶ 9; *see* Dkt. 34 ¶ 9.

Plaintiffs do not allege any facts that could establish their entitlement to tolling of the statutes of limitations. Plaintiffs include only the conclusory allegation that "due to the surreptitious nature of the interceptions at issue, [Plaintiffs] did not realize confidential information related to [their] medical prescription[s] was intercepted by Defendants until September 2024, after contacting undersigned counsel." SAC ¶¶ 7, 9. That bald assertion is not enough to invoke the discovery rule. Tolling under that rule "only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005); *see also Wilson v. El-Daief*, 964 A.2d 354, 361-62 (Pa. 2009) (discovery rule lasts only "until the plaintiff … reasonably should discover, that she has been injured"). A plaintiff must "specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808 (citation omitted);

*see also Coyne v. Porter-Hayden Co.*, 428 A.2d 208, 210 (Pa. Super. 1981) (plaintiff "must allege … facts which show why the action could not have been brought earlier").

Here, Plaintiffs fail to allege facts sufficient to satisfy either requirement. Although Plaintiffs now include a vague reference to "contacting … counsel," that allegation provides no indication as to how Plaintiffs actually became aware of their claims or why they could not have done so earlier. *See McCarn v. HSBC USA, Inc.*, 2012 WL 5499433, at *8 (E.D. Cal. Nov. 13, 2012) (alleging that discovery "was made with the assistance of counsel" did not satisfy burden to plead "time and manner" or diligence). And while Plaintiffs refer to the "surreptitious nature of the interceptions," SAC ¶ 7, they ignore that the BlueChew Privacy Policy, to which they were required to agree before making their purchases, specifically informed them that BlueChew could disclose data about their use of its website to third parties. BlueChew's 2022 and 2023 privacy policies disclosed that BlueChew automatically collected information about users' use of its website through various technologies; that it could match such information to personal information; and that it could share personally identifiable information and health information with third-party service providers. *E.g.*, Ex. 17 at 2.

Although this Court found that those disclosures were insufficient to establish consent because they were "ambiguous" and "f[ell] short of providing explicit notification," *see* Dkt. 57 at 8, a disclosure can put a plaintiff on inquiry notice even if it does not establish consent as a matter of law. BlueChew's policies "disclose[d] its use of vended analytics technologies … to collect and analyze user data," and as this Court acknowledged, "BlueChew users may have consented to the disclosure of certain information to Meta" based on their agreement to these policies. *Id.* at 7-8. BlueChew's policies therefore at the very least put Plaintiffs "on inquiry notice of a possible third party" that caused the "injury" they now claim. *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 902 (N.D. Cal. 2023) (rejecting application of discovery rule to CIPA claims where privacy policy stated defendant "'may use third party vendors to assist' it with the collection of visitors' personal information"); *cf. GoodRx*, 2025 WL 2052302, at *10 (finding "there were no disclosures or other indication" that GoodRx was sharing data). And inquiry notice is all that is required to start the clock for the statute of limitations. *See Javier*, 649 F. Supp. 3d at 902; *see also Eisenberg v.*

*Citibank, NA*, 787 F. App'x 929, 930-31 (9th Cir. 2019) (rejecting delayed discovery rule where loan documents gave plaintiff "constructive notice" of claim, even if she "did not read or understand" them). Because their discovery rule allegations fail, and Plaintiffs allege no other basis for tolling, Plaintiffs' CIPA and WESCA claims should be dismissed.

### C. Plaintiffs' CIPA And WESCA Claims Fail Because Plaintiffs' Allegations That Meta Received Information Do Not Show That Meta Violated The Statutes

Plaintiffs' claims for wiretapping and eavesdropping also fail because there is a fundamental mismatch between the conduct Plaintiffs allege and the statutes they invoke. Each of the provisions Plaintiffs rely on requires real-time acquisition of a user's communications while those communications are in transit to their intended recipient. *See infra* at 16-18. And for Section 632 and WESCA, the statutes further require that the acquisition be accomplished through "use" of a device. But here, Plaintiffs allege only that Meta *received* data as a result of *BlueChew's* use of Pixel code—not that Meta itself read, eavesdropped upon, or intercepted any user communications while those communications were being sent to BlueChew. Meta's conduct thus falls outside the plain text of each statute. Indeed, a criminal statute that penalizes Meta's passive conduct here would be so capacious that it would not "give fair notice of conduct that is forbidden," and would invite arbitrary enforcement. *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Thus, both the rule of lenity and principles of constitutional avoidance counsel in favor of a narrow construction. *Doe v. Eating Recovery Ctr.*, 2025 WL 2971090, at *1, *6 & n.9 (N.D. Cal. Oct. 17, 2025) (construing Section 631 narrowly given rule of lenity and vagueness concerns); *People v. Hyatt*, 109 Cal. App. 5th 735, 793-94 (2025) (criminal statute must be construed "as favorably to the defendant as its language and the circumstances of its application may reasonably permit").

***CIPA Section 631.*** Section 631 requires Plaintiffs to show that (1) Meta "read" or "learn[ed]" the contents of their communications, (2) while those communications were in transit. Cal. Penal Code § 631(a); *R.C. v. Sussex Publishers, LLC*, 2025 WL 948060, at *7 (N.D. Cal. Mar. 28, 2025). "[R]ead" and "learn" connote an effort to "understand the meaning of a communication." *Torres v. Prudential Fin., Inc.*, 2025 WL 1135088, at *6 (N.D. Cal. Apr. 17,

2025), *appeal pending*, No. 25-3203 (9th Cir.); *see Eating Recovery Ctr.*, 2025 WL 2971090, at *6 (similar). The reading "must occur contemporaneous[ly] with the sending or receipt of the message." *Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp. 3d 751, 759 (N.D. Cal. 2023).

Plaintiffs cannot satisfy those requirements. Plaintiffs allege that when a user took certain actions on BlueChew's website, Pixel code "sent [] instructions back to the individual's browser," SAC ¶ 38, which recorded specific "events" called "AddToCart" and "CompleteRegistration" that reflected "information about which prescription the patient was purchasing," *id.* ¶ 40. Plaintiffs allege that BlueChew then sent those events to Meta using Pixel code that BlueChew configured, along with identifiers, *id.* ¶¶ 44, 53, and that Meta "processed, analyzed, and assimilated" the data "*[a]fter* collecting and intercepting" it, *id.* ¶ 56 (emphasis added). So on Plaintiffs' own allegations, Meta did not *read or learn—i.e.*, substantively understand—the data while it was *in transit*. *See R.C.*, 2025 WL 948060, at *7 (allegations that data is "sent to 'Google for processing'" and Google later "aggregates and organizes the data" did not allege reading data in transit). Nor, in any event, is automated "processing" enough to show reading or learning contents. *Williams v. DDR Media, LLC*, 757 F. Supp. 3d 989, 994-95 (N.D. Cal. 2024).

***CIPA Section 632.*** Section 632 prohibits "us[ing]" a device to "eavesdrop upon" or "record" a communication. Cal. Penal Code § 632(a). But Meta did not "us[e]" the Pixel code; as Plaintiffs admit, *BlueChew* was the one that incorporated Pixel code on its website and chose what data to send. *See* SAC ¶ 28 ("advertisers" can "utiliz[e]" Business Tools); *id.* ¶ 29 ("advertisers can integrate" code from the Pixel onto their websites); *id.* ¶ 30 ("advertisers can choose" what to track using code from the Pixel); *see also* ¶¶ 31-33. Plaintiffs' allegations that Meta "creat[ed]" the software, *id.* ¶ 14, do not show that Meta *used* that software to eavesdrop upon Plaintiffs' communications. *See Bailey v. United States*, 516 U.S. 137, 143 (1995) (statute punishing "use" of a firearm requires "active employment of the firearm by the defendant").

Nor did Meta "eavesdrop upon" or "record" Plaintiffs' communications. Eavesdropping or recording must, by their plain meaning, occur in real time as the communication is occurring. The statute thus reaches only "simultaneous dissemination" of a plaintiff's communications, not "secondhand repetition of [] contents." *Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 191, 200 (2021).

But here, Plaintiffs allege that BlueChew's website generated "events," SAC ¶ 40, in response to user actions, which BlueChew then sent to Meta via the BlueChew-configured Pixel code along with identifiers, *id.* ¶ 44. In other words, Meta received "events" only "secondhand." That is not the eavesdropping on or recording of Plaintiffs' communications that Section 632 prohibits.

***WESCA.*** WESCA similarly prohibits "intercept[ion]" only through "use" of a "device," Pa. Cons. Stat. § 5702, and "only contemporaneously with transmission." *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 & n.6 (3d Cir. 2003); *Commonwealth v. Proetto*, 771 A.2d 823, 829 (Pa. Super. 2001) (no "interception" where "no contemporaneous acquisition of the communication"). But again, Plaintiffs do not, and cannot, allege that *Meta* "used" Pixel code when BlueChew was concededly the one that "integrate[d]" the code into its website and controlled what information would be sent. SAC ¶ 29. And Plaintiffs do not plausibly allege that Meta acquired their communications "during transmission" to BlueChew, only that BlueChew *sent* event data to Meta. *Id.* ¶¶ 40, 44. That does not suffice under WESCA's plain terms. And, as discussed above, any ambiguity should be construed in Meta's favor.

### D. All Of Plaintiffs' Claims Against Meta Fail Because Plaintiffs Fail To Allege That Meta Intended To Intercept Sensitive Data

Not only do Plaintiffs fail to allege that Meta engaged in any conduct prohibited by CIPA and WESCA, they also fail to allege Meta acted with the requisite mens rea. Plaintiffs' allegations that BlueChew improperly disclosed information without proper consent do not plausibly allege that Meta acted *intentionally* or *willfully* to obtain their allegedly sensitive information—as each claim requires. Cal. Penal Code §§ 631, 632; 18 Pa. Cons. Stat. § 5703; *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286, 295 (2009) ("intentional[] intru[sion]" required for invasion of privacy).

To establish intent, Plaintiffs must allege that Meta acquired the alleged data "purposefully and deliberately and not as a result of accident or mistake." *United States v. Christensen*, 828 F.3d 763, 790 (9th Cir. 2015) (citation omitted); *see also Kline v. Security Guards, Inc.*, 159 F. Supp. 2d 848, 853 (E.D. Pa. 2001) ("the enumerated acts must be intentional to be unlawful" for civil liability under WESCA). Meta must have "intended to collect the kinds of communications at issue in this lawsuit." *Doe I v. Google LLC*, 2025 WL 1616720, at *2 (N.D. Cal. June 6, 2025). That is,

Plaintiffs must allege facts showing that Meta "acted consciously and deliberately with the *goal* of intercepting" their health information. *Christensen*, 828 F.3d at 791 (emphasis added).

Plaintiffs' allegations here fall far short. Plaintiffs make conclusory assertions that Meta "intentionally tapped" internet lines and "willfully" read or learned the contents of communications. SAC ¶¶ 101-102. But Plaintiffs admit that it was *BlueChew*, not Meta, that chose to incorporate code from the Pixel on its website and configured that code to transmit particular data. *See supra* at 3, 17. Plaintiffs do not allege any facts suggesting *Meta* chose whether, where, or how BlueChew would install and configure code from the Pixel, or what data BlueChew would send. Plaintiffs' conclusory allegations are therefore insufficient to establish intent. *See, e.g.*, *Iqbal*, 556 U.S. at 686-87 ("conclusory" allegation of discriminatory intent insufficient); *Lloyd*, 2024 WL 3325389, at *1 ("conclusory assertion" of intent based on third-party misconduct insufficient).

Plaintiffs' allegations that Meta "knew that it intercepted each of a users' interactions on the Website" and "knew that the incorporation of its software … would result in its interception of PHI," SAC ¶ 14, fare no better. Those bare assertions are contradicted by Plaintiffs' other allegations that "advertisers can choose" which "events" to send to Meta, and even create their own events. *E.g.*, *id.* ¶ 30. And Plaintiffs' own cited sources also show that Meta tells developers how to *avoid* sending certain information. For example, a web developer can avoid sending information by simply not integrating Pixel code on a particular web page. *See* Ex. 2 at 2 (cited at SAC ¶ 30 n.17) (explaining that standard events are included "only on the pages you added them to"). And Meta describes how to "configure" Pixel code not to send specific data, including "button click" data. *See* Ex. 4 at 9 (cited at SAC ¶ 30 n.17); *see also id.* at 8 (describing method to "restrict the data sent to one of the Pixels on [a developer's] website"). These allegations and sources belie the assertion that Meta "knew" that BlueChew's use of code from the Pixel would have any particular result. And Plaintiffs' allegation that code from the Pixel is "automatically" configured to send certain information, SAC ¶ 30, is insufficient for the same reason—Meta tells developers how to modify any such default configuration and *developers* are responsible for choosing whether and how to integrate Pixel code onto their own websites. Thus, Plaintiffs' only relevant allegations here are contradicted by other facts they plead and the sources they cite.

Meta's Business Tools Terms further undermine Plaintiffs' conclusory intent allegations. Those terms expressly require websites to have "all of the necessary rights and permissions and a lawful basis" to collect and use the data they share. Ex. 20 at 1. And Meta also requires businesses to "represent and warrant that [they] will not share Business Tool Data with [Meta] that [they] know or reasonably should know … includes health … information" or "sensitive" information. *Id*. Accordingly, to the extent BlueChew integrated code from the Meta Pixel on its website in a way that transmitted health or sensitive information, *see* SAC ¶¶ 14, 110, 115, 117, BlueChew violated Meta's Business Tools Terms. But *BlueChew's* alleged failure to comply with Meta's terms cannot demonstrate *Meta's* intent. As another court concluded in a case involving the alleged transmission of health data through code from the Pixel, the Business Tools Terms show that "Meta either had no intention of receiving the data at issue or had some alternative mens rea not rising to the level of intentionality." *B.K. v. Desert Care Network*, 2024 WL 1343305, at *7 (C.D. Cal. Feb. 1, 2024) (dismissing CIPA claim); *cf. Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1063 (N.D. Cal. 2016) (plaintiff's allegation that Facebook failed to remove offensive content did not plausibly allege intentional conduct by Facebook).

Plaintiffs nevertheless fault Meta for allegedly failing to "prevent" developers from sending sensitive information and for the "continued incorporation of" Pixel code on BlueChew's website. SAC ¶ 14. But these allegations do not establish "purposeful[] and deliberate[]" action on *Meta's* part. *Google Pixel*, 741 F. Supp. 3d at 840 (quoting *Christensen*, 828 F.3d at 790). The failure to "*prevent*" healthcare providers from using source code does not "somehow reveal[] an *intent* to receive private health information"; nor does the "inadvertent[]" receipt or use of such data constitute "willful or intentional conduct." *Id.* at 840-41, 844 (emphases added).

This Court held in *GoodRx* that plaintiffs had sufficiently alleged intent where they alleged Meta knew that GoodRx's incorporation of Pixel code would result in Meta receiving health information, Meta allegedly "did not take any steps to prevent the interception of this data," and Meta allegedly monetized the information. 2025 WL 2052302, at *8. In doing so, the Court followed cases like *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064 (N.D. Cal. 2023), which hold that "interception may be considered intentional where a defendant is aware of the defect

causing the interception but takes no remedial action," *id.* at 1067 (quoting *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 815 (N.D. Cal. 2020)). But that standard "set[s] the legal bar too low" in light of *Christensen*'s requirement of "purposeful[] and deliberate[]" action. *Google Pixel*, 741 F. Supp. 3d at 840. And, at minimum, the "awareness" reasoning should be limited only to cases involving a *defect* in a defendant's own product, where it is arguably possible to *infer* intent from a defendant's failure to remedy a known issue. *See In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 815 (accidental triggering of Google assistant). That reasoning does not apply here, where Plaintiffs allege *third-party misuse* of code that is commonly and appropriately used on many websites. Nor is it sufficient to allege that Meta monetized any data it received, *see GoodRx*, 2025 WL 2052302, at *8—Plaintiffs must show that Meta intentionally *obtained* the information in the first instance. Where Plaintiffs simply allege "developers were sending sensitive health information in violation of instructions against it," *id.* at *8, Plaintiffs cannot plausibly show intent. But even if the allegations in *GoodRx* were sufficient, they were far more extensive than the conclusory assertions at issue here, which are directly contradicted by the documents Plaintiffs rely on. *See supra* at 20-21; *see* Compl. ¶¶ 66-72, *Doe v. GoodRx*, No. 3:23-cv-0501-AMO, Dkt. 102 (N.D. Cal. May 26, 2023) (allegations about purported ad targeting practices and alleged failures of data filtration systems for "sensitive" data).

Ultimately, holding that the allegations here suffice to show intentional and willful conduct would both contravene the text of the statutes and undermine an important guardrail against the unduly expansive application of these criminal statutes, which already afford companies too little guidance as to what they prohibit. *See supra* at 16 (noting constitutional vagueness concerns); *Gonzales v. Carhart*, 550 U.S. 124, 145-50 (2007) (emphasizing importance of mens rea element in finding law not unconstitutionally vague). This Court should instead follow the Ninth Circuit's instruction in *Christensen* and hold that Plaintiffs' conclusory assertions fall short.

**E. Plaintiffs' Claims Fail For Additional Reasons**

Plaintiffs' claims also suffer from numerous claim-specific defects that warrant dismissal.

**1. Plaintiffs' CIPA Section 632 And WESCA Claims Fail Because Intangible Code From The Pixel Is Not A Device**

Plaintiffs' CIPA Section 632 and WESCA claims apply only to use of a "device." *See* Cal. Penal Code § 632(a) (prohibiting "use[] [of] an electronic amplifying or recording *device* to eavesdrop upon or record [a] confidential communication" (emphasis added)); 18 Pa. Cons. Stat. § 5702 (defining "intercept[ion]" as "acquisition of the contents of wire, electronic or oral communication, through the use of any electronic, mechanical or other *device*" (emphasis added)).

But Pixel code is not a "device" within the meaning of either statute. It is source code. *See* SAC ¶¶ 7, 29-30. As another court held in interpreting Section 637.7 of CIPA, software code is not a "device" under the plain meaning of that term. *See Moreno v. San Francisco Bay Area Rapid Transit Dist.*, 2017 WL 6387764, at *4-5 (N.D. Cal. Dec. 14, 2017). Rather, dictionaries define "device" to mean a specialized piece of *physical* equipment. For example, "Merriam-Webster defines 'device' in relevant part as 'a piece of equipment or a mechanism designed to serve a special purpose or perform a special function,' for example, 'smartphones and other electronic devices' or a 'hidden recording device.'" *Id.* at *5 (citing Device, Merriam-Webster Online, (https://www.merriam-webster.com/dictionary/device) (2017)).

Statutory context also supports reading "device" to refer to something tangible. California courts "generally presume the Legislature intended [a] word … to have the same meaning each time it is used" when "the same word … appears in different places within a statutory scheme." *People v. Braden*, 14 Cal. 5th 791, 806 (2023) (citation omitted). That "well-established canon[]" applies here, where Section 632 and Section 637.7 are part of the same legislative act and prohibit using a "device" to record or track information. *Id.* The term "device" in Section 632 should therefore be construed consistently with its interpretation under Section 637.7.

Furthermore, under the canon of *noscitur a sociis*, "a specific item in a statutory list of items is qualified by the overall type or subject matter characterizing the list," and should be construed accordingly. *Davis v. Fresno Unified Sch. Dist.*, 14 Cal. 5th 671, 689 (2023). Both CIPA Section 632 and WESCA use the term "device" alongside *tangible* objects. Section 632, for example, uses the term "device" in providing that the improperly recorded conversations must take place "by means of a telegraph, telephone, or other device, except a radio." Cal. Penal Code § 632. Similarly, WESCA defines "device" with reference to tangible objects: an "electronic, mechanical,

or other device" is "[a]ny device or apparatus, including, but not limited to, an induction coil or a telecommunication identification interception device" other than a "telephone or telegraph instrument," "hearing aid," or certain other "equipment or devices." 18 Pa. Cons. Stat. § 5702. The term "device" in both statutes is thus properly limited to tangible objects based on the "company [it] keep[s]." *Mountain Vill. v. Bd. of Supervisors*, 828 A.2d 411, 414 (Pa. Commw. 2003). And to the extent there is any ambiguity, these criminal statutes must be construed "as favorably to [Meta] as [their] language and the circumstances of [their] application may reasonably permit." *Hyatt*, 109 Cal. App. 5th at 793-94; *see Eating Recovery Ctr.*, 2025 WL 2971090, at *6 (applying rule of lenity to ambiguous provision of CIPA). Plaintiffs thus fail to plausibly allege that Meta used any "device" to intercept, eavesdrop, or record, as their CIPA Section 632 and WESCA claims require.

### 2. Plaintiff M.D.'s Section 632 Claim Fails Because He Does Not Allege His Communications Were 'Confidential'

Plaintiffs' CIPA Section 632 claim fails for yet another reason: Plaintiffs fail to allege that their communications with BlueChew were "confidential" as the statute defines that term. Section 632 defines "confidential communication" to "exclude[] a communication made … in any … circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." Cal. Penal Code § 632(c). To qualify, "at least one party to the conversation must carry 'an objectively reasonable expectation that the conversation is not being overheard or recorded'"—including by the other party to the conversation. *Rodriguez v. Google, LLC*, 2021 WL 2026726, at *7 (N.D. Cal. May 21, 2021) (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 776-77 (2002)).

Here, Plaintiffs do not, and cannot, allege an "objectively reasonable expectation" that their purchase actions were not being recorded. Even aside from BlueChew's and Meta's express disclosures, *supra* at 5-6, 12, purchase information is, by its very nature, recorded to fulfill customers' orders. *See Boulton v. Community.com, Inc.*, 2025 WL 314813, at *2 (9th Cir. Jan. 28, 2025) (affirming dismissal of Section 632 claim based on text messages, which "are by nature recorded and so cannot be 'confidential communications'"). Plaintiffs allege that they "did not expect third parties, specifically Facebook," to receive their information, SAC ¶ 111, but "that

expectation … does not reasonably give rise to the expectation that *nobody* (including the [website]) would record the communications," as required. *Rodriguez*, 2021 WL 2026726, at *7. Where, as here, "the circumstances reflect that the communications could have easily been shared or viewed," those communications are not "confidential" within the meaning of Section 632. *People v. Nakai*, 183 Cal. App. 4th 499, 518 (2010) (internet chats not "confidential").

Some courts in this District, including this Court, have found that certain internet communications are confidential because users might have a reasonable expectation of *privacy* in the content of those communications based on their subject matter. *See GoodRx*, 2025 WL 2052302, at *14. In this unique statutory context, however, a general expectation of privacy does not suffice. Rather, the California Supreme Court has held that the focus is on reasonable expectations *about recording*, rather than any asserted privacy interest in the information itself. *See Flanagan*, 27 Cal. 4th at 776 (rejecting content-based test for "confidential communication"). Because the statutory definition of "confidential" turns on reasonable expectations of whether a communication would be *recorded* (by anyone), Plaintiffs cannot state a Section 632 claim based on their internet purchases, which were necessarily recorded by BlueChew.

#### 3. Plaintiff M.D.'s Clause One Section 631 Claim Fails Because He Does Not Allege Any Telephonic Communications

Plaintiff M.D.'s Section 631 claim should also be dismissed to the extent it rests on the first clause of Section 631(a). *See* SAC ¶ 96. That clause "restricts liability to telephone and telegraph technology," and so "does not apply to the internet." *Cody v. Ring LLC*, 718 F. Supp. 3d 993, 999-1000 (N.D. Cal. 2024) (Martínez-Olguín, J.). Plaintiff M.D. alleges interception of communications made over the internet only, SAC ¶¶ 98, 101, so clause one does not apply.

#### 4. Plaintiff M.D.'s Invasion Of Privacy Claim Fails Because He Does Not Plead Highly Offensive Conduct

Plaintiff M.D.'s California invasion of privacy claim also fails because Plaintiffs' allegations that *BlueChew* sent sensitive data to Meta fail to show that *Meta* committed any highly offensive intrusion, as required by California law. The "highly offensive" standard "set[s] a high bar." *Belluomini v. Citigroup Inc.*, 2013 WL 5645168, at *3 (N.D. Cal. Oct. 16, 2013). The

invasion must be "sufficiently serious" to constitute "an *egregious breach* of [] social norms." *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (quoting *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 26, 37 (1994)). Collection or "disclosure of highly personal information" does not suffice absent "blatantly deceitful" conduct or other bad acts. *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022) (collection of app usage information not highly offensive, even if plaintiffs had a reasonable expectation of privacy); *see In re iPhone Application Litig.*, 844 F. Supp. 2d at 1063 (disclosure of "personal data" not highly offensive).

In *M.G. v. Therapymatch, Inc.*, 2024 WL 4219992 (N.D. Cal. Sept. 16, 2024) (Martínez-Olguín, J.), for example, this Court recognized that disclosure of "certain personal information, such as social security numbers," does not rise to the level of highly offensive conduct. *Id.* at *6. But it found a potential "factual dispute" as to whether there was a highly offensive invasion where the plaintiff alleged the defendant website, a mental-health platform, had *itself* "embedded tracking technology code on its website" that shared private medical information; had not enabled an available "anonymization feature"; and had not disclosed the challenged data sharing—something the defendant did not contest. *See id.* at *1, *5, *6.

The circumstances here are starkly different. At most, Plaintiffs allege that Meta *received* purchase data from BlueChew and that Meta used that information for targeted advertising—as its terms disclosed it would. Plaintiffs do not allege that Meta had any hand in BlueChew's choice to install code from the Pixel, much less that Meta acted deceptively to obtain Plaintiffs' information. And Plaintiffs' new allegations about BlueChew's supposed obligations under the CCPA, SAC ¶¶ 79-81, cannot show that *Meta* engaged in any highly offensive conduct. Meta's mere receipt of information is hardly an "egregious breach of [] social norms," even if the information is sensitive. *See In re iPhone Application Litig.*, 844 F. Supp. 2d at 1063 (citation omitted). That is particularly true where Meta required web developers to provide prominent notice regarding use of the Pixel code and prohibited the sending of sensitive or health information. *See supra* at 20.

## V. CONCLUSION

The Court should dismiss the SAC with prejudice.

Dated: December 8, 2025

Respectfully submitted,

LATHAM & WATKINS LLP

By <u>*/s/ Melanie M. Blunschi*</u>

Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
Kristin Sheffield-Whitehead (Bar No. 304635)
*kristin.whitehead@lw.com*
Catherine A. Rizzoni (Bar No. 322267)
*cat.rizzoni@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Margaret A. Upshaw (*pro hac vice*)
*maggie.upshaw@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendant*
*Meta Platforms, Inc.*